### RECORD NO. 12-2572

---

## IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

### CORE COMMUNICATIONS, INCORPORATED,

*Plaintiff-Appellant,*

v.

### VERIZON MARYLAND, INCORPORATED, et al.,

*Defendants-Appellees.*

---

### OPENING BRIEF OF PLAINTIFF-APPELLANT

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND AT BALTIMORE

**Ralph L. Gleaton, II**
**GLEATON WYATT HEWITT, PA**
**Suite 203**
**935 South Main Street**
**Greenville, South Carolina 29601**
**(864) 250-9780 (Telephone)**
**ralph@pgwhlaw.com**

**Counsel for Plaintiff-Appellant**

---

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 12-2572    Caption: Core Communications, Inc. v. Verizon Maryland, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Core Communications, Inc.
(name of party/amicus)

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/amicus)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
   If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
   If yes, identify all such owners:

- 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Ralph Gleaton _____    Date: _____ 01/10/2013 _____

Counsel for: Core Communications, Inc _____

## CERTIFICATE OF SERVICE
**********************************

I certify that on _____ 01/10/2013 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Scott H. Angstreich
Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC
1615 M Street, NW, Suite 400
Washington, DC 20036-3215

/s/ Ralph Gleaton _____            _____ 01/10/2013 _____
(signature)                                        (date)

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT

TABLE OF CONTENTS.................................................................i

TABLE OF AUTHORITIES ......................................................... iii

STATEMENT OF SUBJECT MATTER
AND APPELLATE JURISDICTION ....................................................1

STATEMENT OF THE ISSUES.........................................................1

STATEMENT OF THE CASE...........................................................1

STATEMENT OF FACTS ...........................................................10

SUMMARY OF ARGUMENT .......................................................16

ARGUMENT .......................................................................17

    I.    Standard of Review ......................................................17

    II.    The District Court Erred In Reversing Its August 10 Order
         Finding that Core is Entitled to Actual Damages as a Result of
         Verizon's Breach of the ICA..............................................18

    III.    The District Court Erred in not Allowing Core's Tort Claims ..........37

         1.    Unfair Competition .................................................37

         2.    Concealment........................................................41

         3.    Intentional/Negligent Misrepresentation ..................................46

CORE'S TORT CLAIMS ARE ALLOWED
UNDER MARYLAND LAW..........................................................46

MALICE ...................................................................................48

CONCLUSION .........................................................................52

REQUEST FOR ORAL ARGUMENT ......................................52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITY

**Page(s)**

**Cases:**

*American Laundry Mach. Indus. v. Horan,*
  45 Md. App. 97, 412 A.2d 407 (1980) .......................................47

*Baltimore Bedding Corp. v. Moses,*
  182 Md. 229, 34 A.2d 338 (1943) ...................................37, 38, 41

*Bell Atl. Md., Inc. v. MCI WorldCom,*
  240 F.3d 279 (4th Cir.2001) ...............................................32

*BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., Inc.,*
  317 F.3d 1270 (11th Cir.2003) ............................................32

*Celotex Corp. v. Catrett,*
  477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ...............17

*Competitive Telecommunications Ass'n v. F.C.C.,*
  117 F.3d 1068 (8th Cir. 1997) ............................................31

*Core Commc'n Inc. v. Verizon Pa., Inc.,*
  493 F.3d 333 (3d Cir. 2007) ...........................................11, 32

*Coserv Ltd. Liab. Corp. v. Sw. Bell Tel. Co.,*
  350 F.3d 482 (5th Cir. 2003) .............................................28

*Delmarva Sash & Door Co. of Maryland, Inc. v. Andersen Windows, Inc.,*
  218 F.Supp.2d 729 (D.Md Aug. 30 2002) ................................41

*Drug Fair v. Smith,*
  263 Md. 341, 283 A.2d 392 (1971) ....................................48, 49

*Electronics Store, Inc. v. Cellco Partnership,*
  732 A.2d 980 (1999) ......................................................40

First Report and Order, *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*,
    11 FCC Rcd 15499 (1996)................................................................27

*GAI Audio of New York, Inc. v. Columbia Broadcasting System, Inc.*,
    27 Md.App. 172, 340 A.2d 736 (1975) ....................................41, 48

*General Motors Corp. v. Piskor*,
    281 Md. 627, 381 A.2d 16 (1977) ................................................47

*Gilliam v. Armtex, Inc.*,
    820 F.2d 1387 (4th Cir.1987) ......................................................51

*Global Naps, Inc. v. Bell Atl.-New Jersey, Inc.*,
    287 F. Supp. 2d 532 (D.N.J. 2003)..............................................30

*H & R Block, Inc., et al. v. Testerman*,
    275 Md. 36, 338 A.2d 48 (Md. 1975) ....................................47, 48

*Heathcoat v. Potts*,
    905 F.2d 367 (11th Cir. 1990), *cited favorably in*,
    *In re DNA Ex Post Facto Issues*,
    466 F. App'x 235 (4th Cir. 2012).................................................14

*Ihnken v. Gardner*,
    CCB-11-3508, 2013 WL 772955 (D. Md. Feb. 272, 2013).........................22

*Ill. Bell Tel. Co. v. Worldcom Techs., Inc.*,
    179 F.3d 566 (7th Cir.1999) ........................................................32

*In the Matter of the Review By the Commission Into Verizon Maryland Inc.'s Compliance with the Conditions of 47 U.S.C. §271(c)*,
    Md. P.S.C. Docket No. 8921 (Dec. 16, 2002)..............................23

*In the Matter of the Complaint of Core Communications, Inc. v. Verizon Maryland, Inc.*,
    Md. P.S.C. Case No. 9005 ............................................................23

*In Re Chaires*,
    249 B.R. 101 (U.S.B.C, D.Md 2000) ...........................................51

*Iowa Utils. Bd. v. FCC,* 120 F.3d 753 (8th Cir.1997),
  *reversed in part on other grounds,*
  *Iowa Utils. Bd.,*
  525 U.S. 366, 119 S.Ct. 721 (1999) ............................................................32

*Kim v. Parcel K-Tudor Hall Farm LLC,*
  11-2274, 2012 WL 6554884 (4th Cir. Dec. 17, 2012) ..................................17

*Knickerbocker Co. v. Gardiner Co.,*
  107 Md. 556, 569-70, 69 A. 405, 410 (1908)................................................47

*Litman v. Massachusetts Mutual Life Insurance Co.,*
  825 F.2d 1506 (11th Cir.1987) ......................................................................14

*Lumley v. Guye,*
  2 E. & B. 216, 118 Eng. Rep. 749 (K.B. 1853)............................................47

*Miller Building Supply, Inc. v. Rosen,*
  305 Md. 341, 503 A.2d 1344 (Md. Ct. App. 1986)......................................48

*Parklane Hosiery Co., Inc. v. Shore,*
  439 U.S. 322, 99 S. Ct. 645, 58 L. Ed. 2d 552 (1979) ..........................14, 21

*PC COM, Inc. v. Proteon, Inc.,*
  946 F.Supp. 1125 (S.D.N.Y 1996) ................................................................37

*Peterson v. Air Line Pilots Ass'n, Int'l,*
  759 F.2d 1161 (4th Cir. 1985) ..................................................................34, 36

*Petition of Cavalier Tel. LLC Pursuant to Section 252(e)(5) of the*
*Communications Act for Preemption of the Jurisdiction of the*
*Virginia State Corporation Commission Regarding*
*Interconnection Disputes with Verizon Virginia Inc. and for Arbitration,*
  18 FCC Rcd 25887 (WCB 2003) ..................................................................28

*Piambino v. Bailey,*
  757 F.2d 1112 (11th Cir.1985) ......................................................................14

*P.R. Tel. Co. v. Telecomms. Regulatory Bd.,*
  189 F.3d 1 (1st Cir.1999)...............................................................................32

*Rhee v. Highland Development Corporation, et al.*,
   958 A.2d 385, 182 Md.App. 516 (Md.App. 2008)..........................................42

*Saval v. BL, LTD*,
   710 F.2d 1027 (4th Cir. 1983) ........................................................47

*Seigman v. Equitable Trust Co.*,
   267 Md. 309, 297 A.2d 758 (1972) .................................................48

*Sprague v. Ticonic Nat'l Bank*,
   307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939) .......................................13

*Sw. Bell Tel. Co. v. Brooks Fiber Commc'ns of Okla., Inc.*,
   235 F.3d 493 (10th Cir.2000) ........................................................32

*Sw. Bell Tel. Co. v. Pub. Util. Comm'n of Tx.*,
   208 F.3d 475 (5th Cir.2000) ........................................................32

*Teaching Co. Ltd. Partnership v. Unapix Entertainment, Inc.*,
   87 F.Supp.2d 567 (E.D.Va.2000)
   (citing *Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.*,
   958 F.2d 594, 600 (4th Cir.1992))....................................................51

*Translucent Commc'ns LLC v. Americas Premier Corp.*,
   Civ. No. WGC-08-3235 (D.Md. Feb. 24, 2010) .........................................41

*U.S. v. Bell*,
   5 F.3d 64 (4th Cir. 1993) ...........................................................14

*Verizon Communications Inc. v. FCC*,
   535 U.S. 467, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002) .........................44, 50

*Verizon Maryland, Inc. v. Core Communications, Inc.*,
   631 F.Supp.2d 690 (2009) .....................................................2, 6, 20

*Verizon Maryland, Inc. v. Core Communications, Inc.*,
   405 Fed.Appx. 706 (4th Cir. 2010) ........................................*passim*

*Verizon Maryland Inc. v. RCN Telecom Services, Inc.,*
    232 F. Supp. 2d 539 (D. Md. 2002)
    *aff'd in part, dismissed in part sub nom.*
    *Verizon Maryland, Inc. v. Global NAPS, Inc.,*
    377 F.3d 355 (4th Cir. 2004) .......................................................33

*Verizon Md., Inc. v. Global NAPS, Inc.,*
    377 F.3d 355 (4th Cir. 2004) .......................................................11

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,*
    535 U.S. 635, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) ..............32

*Victor Stanley, Inc. v. Creative Pipe, Inc.,*
    Civ. No. MJG-06-2662 (D.Md. Sept. 30, 2011) ....................38, 41

*Westbrook v. Zant,*
    743 F.2d 764 (11th Cir.1984)
    (quoting *Dorsey v. Continental Casualty Co.,*
    730 F.2d 675 (11th Cir.1984)).....................................................14

*Westfarm Associates Ltd. P'ship v. Int'l Fabricare Inst.,*
    846 F. Supp. 439 (D. Md. 1993)
    *aff'd sub nom. Westfarm Associates Ltd. P'ship v. Washington*
    *Suburban Sanitary Comm'n,* 66 F.3d 669 (4th Cir. 1995) ...........33

*Wheeler v. City of Pleasant Grove,*
    746 F.2d 1437 (11th Cir.1984) ....................................................14

*Wolf v. Ford,*
    335 Md. 525, 644 A.2d 522 (1994) ....................................8, 19, 25

## Statutes and Regulations

47 C.F.R. §§ 51.305, 51.311, 51.313 ...................................................11

47 C.F.R. §§ 51.305(a)(3) to (a)(5), 51.311(a) to (c), and 51.313(b) ....................15

47 C.F.R. § 51.305(g) .........................................................................43

47 C.F.R. § 64.2005 ...........................................................................45

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 2107 ...................................................................................1

47 U.S.C. § 251 ...............................................................16, 28, 44, 50

47 U.S.C. §§ 251(b)-(c) ...............................................................11, 28

47 U.S.C. § 251(c) ....................................................................*passim*

47 U.S.C. § 251(c)(2) ...........................................................................31

47 U.S.C. §§ 251(c)(2)(B)-(D) ...........................................................10

47 U.S.C. § 252 ..............................................................................28, 29

47 U.S.C. § 252(a)(1) ....................................................................11, 28

47 U.S.C. § 252(b)(1) ...........................................................................28

47 U.S.C. § 252(e)(1)-(2) ....................................................................11

47 U.S.C. § 252(i) ..................................................................................11

47 U.S.C. § 253(a) .................................................................................44

47 U.S.C. § 271(c) .................................................................................23

47 U.S.C.A. § 222(b) ............................................................................45

F.R.C.P. Rule 8(c) .........................................................................33, 35

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This case is an appeal of the judgment issued by the United States District Court for the District of Maryland (the "District Court") on January 16, 2013, which awarded the Plaintiff Core Communications, Inc. ("Core") nominal damages in the amount of $1.00. J.A. 667. Under 28 U.S.C. § 2107, Core filed a timely notice of appeal of the District Court's order on January 17, 2013. J.A. 669. The Court has jurisdiction under 28 U.S.C. § 1291 as an appeal of a final decision of the District Court. In conjunction with its appeal of the Judgment, Core appeals those portions of the District Court's summary judgment orders dated August 10, 2012 and November 27, 2012 which dismissed, in whole or in part, Core's claims in this case. J.A. 643, 664.

## STATEMENT OF THE ISSUES

I.    Did the District Court err in reversing its own ruling that Core is entitled to actual damages and finding, on summary judgment, that Core is entitled only to nominal damages instead?

II.    Did the District Court err in dismissing Core's tort claims on summary judgment?

## STATEMENT OF THE CASE

This appeal challenges summary judgment rulings of the District Court which (1) limited Core's rights to contractual damages to the nominal amount of $1.00 based

on an exculpatory clause; and (2) dismissed Core's tort claims in their entirety. This is the second time this case has reached this Court on appeal from the District Court. In Case 09-1839, this Court heard Core's appeal from the District Court's June 30, 2009 Memorandum and Order granting Verizon's motion for summary judgment in Case JFM-08-00503 (the "Declaratory Judgment Action"). In that order, the District Court vacated orders of the Maryland Public Service Commission (the "Commission") in which the Commission found that Verizon had breached provisions of a Commission-approved "interconnection agreement" (or "ICA") with Core by refusing to interconnect in an expedited manner as requested by Core, and had also violated the implied duty of good faith and fair dealing under Maryland law. The District Court found that Verizon had not violated the ICA and made no ruling on the duty of good faith. *See generally*, Memorandum, *Verizon Maryland, Inc. v. Core Communications, Inc.* (June 30, 2009)("*Verizon I*"). J.A. 133.

On appeal, the Court (1) found "that Verizon had a duty to provide Core with the requested interconnection and therefore breached its contract," (2) reversed the District Court's grant of summary judgment; (3) remanded "for further proceedings consistent with this decision including a determination of damages;" and (4) "remand[ed] the question of whether Verizon also breached an implied duty of good faith and fair dealing to the district court for further consideration." Unpublished Opinion, *Verizon Maryland, Inc. v. Core Communications, Inc.*, Case No. 09-1839 (Dec. 16, 2010)("*Verizon II*"), at

2

20-21. The facts of the case and its procedural history to that point are set forth in the Court's opinion. *Verizon II*, at 4-12. J.A. 136-142.

Core's original complaint alleging that Verizon unlawfully delayed interconnection in Baltimore was filed with the Commission on October 8, 1999. The Commission docketed the complaint as Case 8881. J.A. 308. Following extensive discovery, pre-filed testimony and hearings, entry of a proposed order by a Hearing Examiner, and appeals thereto, the Commission issued Order 78989, finding that Verizon breached the ICA and the duty of good faith, on February 26, 2004. J.A. 336

Meanwhile, because the Commission has no authority to award damages or to adjudicate tort claims, Core filed a complaint against Verizon in the Circuit Court for Baltimore City on August 22, 2002 (the "Damages Action"). The complaint set forth the following causes of action:

1.    Breach of Contract.

2.    Breach of Express Warranty

3.    Promissory Estoppel and Detrimental Reliance

4.    Unjust Enrichment

5.    Intentional Misrepresentation and Concealment

3

6.    Negligent Misrepresentation and Concealment

7.    Unfair Competition (Maryland Law)

J.A. 24

Verizon removed the Damages Action to the District Court on September 27, 2002 and filed its motion to dismiss or in the alternative, answer, on October 3, 2002. J.A. 18.   The Damages Action was docketed as Case 02-cv-3180. On January 8, 2003 the case was administratively stayed with the right of either party to move to reopen the case upon completion of Case 8881 at the Commission, and completion of a related case, docketed at the Commission as Case 9005, involving Core's complaint that Verizon unlawfully delayed interconnection in Damascus, Mt. Airy and Salisbury, Maryland.

On August 8, 2003, the Commission hearing examiner assigned to Case 8881 entered a proposed order finding that Verizon had breached section 27.1 of the ICA and a duty of fair dealing and good faith under Maryland contract law. On February 26, 2004, the Commission issued Order 78989, which affirmed and adopted and expanded upon the Proposed Order.   J.A. 327.   The Commission found:

> [I]t is clear that interconnection of Core over the existing facility was proposed by Core and could have been accomplished in an expeditious manner, apparently sometime around mid-September 1999 as requested by Core, but Verizon refused to do so until construction of new facilities which did not result in interconnection until apparently December 23, 1999.Md. PSC Order, at 6.

4

Continuing, the Commission found that:

> Core's proposal to utilize the existing loop interconnection to meet its time objective would essentially constitute Core's acceptance of the shared facility as being in compliance under the ICA. However, Verizon refused to offer the use of the existing loop and multiplexer once Core expressed its interest and instead denied the use by its assignation to an unnamed customer of record. The fact that this customer happened to be Core itself shows lack of full disclosure by Verizon and failure to deal in good faith, so that the record shows improper delay by Verizon in this interconnection which could have been provided in a more timely manner using the existing excess capacity as proposed by Core. Accordingly, we agree with and affirm the findings of the Proposed Order that Verizon wrongfully delayed interconnection with Core by refusal to interconnect over the existing loop and multiplexer facilities. We further agree that this action of refusing to provide timely interconnection over the existing facility when proposed by Core violates the standards of the ICA that require interconnection equal in quality; at a technically feasible point; and that is just, reasonable and nondiscriminatory; in addition to failure to meet a commercially reasonable standard of good faith. *Id.*, at 6-7.

On February 25, 2008, one day before the applicable statute of limitations ran, Verizon filed the Declaratory Judgment Action seeking "review of decisions of the Commission and the Defendant Commissioners in their official capacities under the federal Telecommunications Act of 1996 . . .," alleging that "[t]he PSC failed to interpret correctly and enforce the parties' interconnection agreement entered into pursuant to the Act, in its orders concerning Defendant Core in Case No. 8881 before the PSC." The District Court granted Summary Judgment for Verizon in the Declaratory Judgment Action, finding that (1) "the PSC misconstrued federal law and the ICA in evaluating the 'equal in quality' interconnection standard against Verizon's end-user retail customers;"

5

(2) "Verizon was under no obligation to amend the ICA to allow interconnection through lesser-quality facilities;" and (3) "Maryland law does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing." *Verizon I*, 631 F.Supp.2d 690, (2009). On appeal, this Court reversed, holding "that Verizon had a duty to provide Core with the requested interconnection and therefore breached its contract." *Verizon II*, J.A. 152, and remanded to this Court "for further proceedings consistent with this decision including a determination of damages" and "whether Verizon also breached an implied duty of good faith and fair dealing." *Id*.

On remand, the parties briefed the District Court with respect to the duty of good faith in the Declaratory Judgment Action. The court denied Verizon's motion for summary judgment without prejudice with leave to renew at a later stage in the litigation. The District Court then consolidated the Damages Action with the Declaratory Judgment Action on October 13, 2011. J.A. 6. Core moved to dismiss three of its seven causes of action (the equitable and warranty causes of action) as moot based on the finding of liability for breach of contract, and to dismiss the Declaratory Judgment Action as moot because the calculation of damages is not different for a breach of the good faith duty than it is for an ordinary breach of contract. J.A. 7. Verizon opposed the motion and moved to dismiss Core's tort

claims. The District Court dismissed the equitable and warranty claims but did not dismiss the Declaratory Judgment Action or the Tort claims. J.A. 8.

After the cases were consolidated, the parties engaged in discovery, and Core submitted an extensive expert damages report. J.A. 671. The parties subsequently filed cross motions for summary judgment. In its motion, Core asked the District Court for summary judgment on its intentional concealment, negligent concealment and unfair competition claims, reasoning that the facts necessary to enter judgment on these claims had already been found, as set forth in *Verizon II*. J.A. 133. In its opposition to Core's motion and cross-motion for summary judgment, Verizon raised factual issues with respect to whether it breached the ICA intentionally, or with malice, and also whether it had deceived Core. Verizon also argued, for the first time, that section 26 of the ICA insulated it from any liability for Core's contract and tort claims. In its reply to Verizon's opposition and opposition to Verizon's motion, Core argued that section 26 does not insulate Verizon from liability in this case for a variety of legal reasons. Core also argued that even if issues of intent, malice and deception could not be determined based on facts as set forth in *Verizon II*, there is ample evidence in the record with which Core could establish each of these elements, including pre-filed testimony before the Commission and the contemporary correspondence between Core and Verizon.

7

On August 10, 2012, the District Court issued a Memorandum Opinion and Order ruling that section 26 did not prevent Core from seeking its actual damages, but that Core's tort claims were dismissed. J.A. 627, 643. The District Court acknowledged that Maryland law recognizes three exceptions to the general rule that exculpatory clauses are enforceable:

> (1) in the event of intentional or grossly negligent conduct; (2) when the contract is the product of grossly unequal bargaining power; or (3) in transactions affecting the public interest. Doc. 66, at 6, *citing*, *Wolf v. Ford*, 644 A.2d 522, 525 (Md. 1994).

With respect to the first exception, the court found that the "Core has put forth no evidence to show that Verizon intended to breach the ICA..." J.A. 632. With respect to the third exception, the court found that "[t]he relationship between Core and Verizon, formed pursuant to the policies and purposes behind the Telecommunications Act, supports application on the public interest exception." J.A. 633. The court concluded that "the exculpatory provision... does not bar Core from proceeding on its tort claims." J.A. 633.

With respect to punitive damages, the District Court found "no evidence" in the record "from which a reasonable jury could find... actual malice." J.A. 634. The court dismissed Core' intentional and negligent concealment claims on the basis that Core could not prove any intent to deceive, or prove the element of reliance. J.A. 635-639. Finally, the court dismissed Core's unfair competition claim on the basis that "there is insufficient evidence... to establish that Verizon

did unlawfully or with improper motive conceal the identity of its customer of record." J.A. 640.

With respect to Core's *contract* claims, the District Court made no ruling on the limitation of liability clause contained in section 26 under Maryland law because, "to the extent that section 26, as a matter of contract, seeks to preclude Core from recovering damages it suffered as a result of an unjustifiable delay in interconnection, it is unenforceable under the federal Telecommunications Act." J.A. 641. The court reasoned that "[a]llowing incumbent carriers to use the leverage they possess to contractually limit their liability for damages caused by creating impediments to, and thereby delaying, interconnection would frustrate" the purposes of the Act. *Id*.

The August 10 Order also dismissed the remainder of the Declaratory Judgment Action, including the issue of bad faith. *Id.*, at note 1.

Both parties filed motions to reconsider. Verizon argued that the court should have upheld application of section 26 because the Telecommunications Act does not bar application of an exculpatory clause. Verizon did not ask the court to reconsider the portion of the Order dismissing the remainder of the Declaratory Judgment Action. Core argued that that the court should have permitted Core to proceed with its tort claims because there is ample evidence on the record to support those claims. In opposing Verizon's motion, Core argued that the court

"was correct in applying the Telecommunications Act of 1996 as a bar to the exculpatory clause, especially when coupled with Maryland public policy." On November 27, 2012, the District Court issued a one-page memorandum and order reversing its prior ruling as to Core's actual damages and upholding the ruling dismissing Core's tort claims. J.A. 663. The court found that "the FCC [had] at least implicitly found that exculpatory clauses, like section 26 of the ICA, are not void under the Telecommunications Act." J.A. 663. Based on this order, the District Court issued a Judgment in favor of Core and against Verizon in the amount of One Dollar ($1.00) on January 15, 2013. J.A. 667.

Core has appealed the Judgment and the District Court Order that the exculpatory clause prevents Core from recovering actual damages and the both District Court Orders dismissing Core's tort claims. Verizon has not appealed the Order dismissing the Declaratory Judgment Action.

## STATEMENT OF FACTS

The basic facts of this case, as stated by this Court in *Verizon II*, have been settled, and are as follows:

> In 1999, Core was beginning to enter the local Baltimore telephone market. By statute, Core was entitled to connectivity with the existing incumbent network that was (1) "technically feasible"; (2) at least equal in quality to that provided by the ILEC [Incumbent Local Exchange Carrier] to "itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection;" and (3) "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory." 47 U.S.C. § 251(c)(2)(B)-(D). In order to expedite negotiations, Core adopted an existing ICA between Verizon, the

10

ILEC in the region, and American Communications Services, Inc. pursuant to 47 U.S.C. § 252(i). The adoption of this agreement was approved by the Commission on September 15, 1999. The agreement stated that Verizon would provide interconnection "in accordance with the performance standards set forth in Section 47 U.S.C. § 251(c) of the Act and the FCC regulations." J.A. 55.

Under 47 U.S.C. § 252(a)(1), ILECs and CLECs [Competitive Local Exchange Carrier] are free to negotiate binding ICAs [Interconnection Agreement] "without regard to" the baseline interconnection performance standards set forth in the Act and the corresponding FCC regulations. See 47 U.S.C. §§ 251(b)-(c); 47 C.F.R. §§ 51.305, 51.311, 51.313; *Verizon Md., Inc. v. Global NAPS, Inc.*, 377 F.3d 355, 390 (4th Cir. 2004). In such circumstances, the generally applicable performance standards will only apply to the extent that the parties have not contracted around them.

All ICAs must be presented to the Commission for approval even when they have been negotiated by the parties. 47 U.S.C. § 252(e)(1)-(2). Commissions have also been vested with the authority to implement and enforce these agreements. *Core Commc'n Inc. v. Verizon Pa., Inc.*, 493 F.3d 333, 335 (3d Cir. 2007). According to the Commission, delays in interconnection are very costly to a new provider because it "cannot operate and earn revenue while it continues to incur expenses." J.A. 276-77. Delays can benefit the ILEC by reducing the chances that the CLEC is successful.

In the summer of 1999, Core initiated contact with Verizon regarding interconnection. On July 27, 1999, Core sent a letter to Verizon requesting an activation date of September 10, 1999. Core calculated this date based on section 4.4.4 of the ICA, which states that interconnection will not occur earlier than forty-five days after the receipt of a request for interconnection by Core. Also, as required by the ICA, Core provided Verizon with forecasts of Core's technical requirements. The letter stated, "[p]lease confirm in writing if the requested interconnection activation date is acceptable, or, if it is not acceptable, please propose an alternate date, together with an explanation why such alternate date is appropriate." J.A. 132-33. Verizon did not respond in writing.

At a meeting on August 11, 1999, the parties agreed to use the "entrance facility" method of interconnection. J.A. 88. Entrance facilities are dedicated transmission facilities that connect ILEC and CLEC locations.

Verizon describes four major steps for provisioning initial interconnection with Core using the entrance facility method: (1) constructing the physical interoffice facility between Verizon's and Core's networks; (2) provisioning transport circuits from Verizon's to Core's Wire Center; (3) provisioning transport circuit; and (4) establishing interconnection trunks between Verizon's switch and Core's switch.

Core requested interconnection with Verizon at its Wire Center on the tenth floor of the Court Square building in Baltimore, Maryland. That floor of the building was "on-net" with Verizon, meaning that it was physically connected to Verizon's central network through fiber feeder cables and an OC-12 multiplexer (hereinafter "OC-12 Mux"). Verizon had turned on an OC-12 Loop Ring at the building in June 1999, meaning that physical construction was complete, the optical signals were transmitting, and the ring was service-ready. At some point, however, the OC-12 Mux was disconnected from the OC-12 Loop Ring.

Verizon claims that on August 11, 1999, it estimated that connection would take between four to six months. In an effort to speed things along, Core asked that Verizon expedite the interconnection process by using the existing OC-12 Loop Ring and OC-12 Mux for interconnection, as this would eliminate the need for Verizon to build new facilities. It also requested an interconnection activation date of September 18, 1999. Verizon agreed that using the existing OC-12 Loop Ring would be technically feasible, but would not commit to Core's proposal at the August 11 meeting until it first checked with other departments. The record indicates that the OC-12 Loop Ring had the capacity sufficient to support Core's initial request.

On August 15, 1999, Verizon informed Core that the OC-12 Mux had been "assigned" to some "customer of record," the identity of whom Verizon would not disclose. Thus, Verizon claimed that the OC-12 Mux was unavailable for interconnection. Later, Verizon admitted that Core was the customer of record for the OC-12 Mux.

12

However, Verizon claims that Core was assigned to the OC-12 Mux in a retail capacity as a "customer" rather than as a "carrier."

On August 31, 1999, Verizon informed Core that, as a matter of policy, it would not use the OC-12 Loop Ring for interconnection, whether or not it was technically feasible. Verizon further explained on September 7, 1999, that it had previously classified the existing OC-12 Mux as a "customer" facility, rather than a "carrier" facility and that the OC-12 Mux would need to be "reinventoried" as a "carrier" facility in order to use it for interconnection. Instead of using the existing facilities, Verizon stated that it would need to physically detach the OC-12 Mux from the OC-12 Loop Ring, construct a new OC-12 ring interoffice facility ring ("New OC-12 IOF Ring"), and insert the multiplexer into the new ring before subsequent steps in the interconnection process could take place.

Core met with Verizon again on September 9, 1999, to express its desire to use the OC-12 Loop Ring for interconnection. As a result of the meeting, Verizon informed Core that it would complete construction of the New OC-12 IOF Ring and establish connection to the Wire Center by November 16, 1999. Core responded on September 24, 1999, that the November 16 date was not acceptable, and that Verizon had not yet articulated a reasonable justification for refusing to use the existing OC-12 Loop Ring for interconnection.

The new OC-12 IOF Ring was completed sometime between November 16, 1999 and November 30, 1999. Once the new OC-12 IOF Ring was "turned up," the parties were able to coordinate subsequent steps in the interconnection process by December 23, 1999, just over four months after the initial meeting between Core and Verizon.[1] J.A. 137-142.

---

[1]    *Verizon II*, at 5-10. The District Court ruled that the facts as set forth by the Court should be disregarded because "courts of appeal do not find facts." August 10, 2012 Order, at 9. However, these facts formed the basis for the Court's conclusion that Verizon breached the ICA, as well as the Court's mandate that the District Court conduct "further proceedings consistent with this decision including a determination of damages." *Verizon II*, at 20. A mandate of a higher court is "controlling as to matters within its compass." *Sprague v. Ticonic Nat'l Bank,* 307 U.S. 161, 168, 59 S.Ct. 777, 780, 83 L.Ed. 1184 (1939)("When a circuit court remands for further proceedings, a district court must, except in rare circumstances, implement both the letter and spirit of the mandate, taking into

13

With respect to Verizon's affirmative defense of exculpation, section 26 of the ICA contains two limitation of liability provisions. Subsection 26.1 of the ICA states:

> Except as may be provided pursuant to Section 27 below, the liability of either Party to the other Party for damages arising out of failure to comply with a direction to install, restore or terminate facilities; or out of failures, mistakes, omissions, interruptions, delays, errors, or defects occurring in the course of furnishing any services, arrangements, or facilities hereunder shall be determined in accordance with the terms of the applicable tariff(s) of the

---

account the circuit court's opinion and the circumstances it embraces. *See*, *U.S. v. Bell*, 5 F.3d 64, (4th Cir. 1993). Moreover, the facts as set forth by the court mirror the facts as found by the Commission, the body entrusted with interpretation and enforcement of the ICA. *See*, Order 78989, at 4-6; *and*, Proposed Order of Hearing Examiner, at 6-13. The Commission's orders and findings of fact were or could have been appealed previously, in the Declaratory Judgment Action, and now, having been incorporated into *Verizon II*, constitute the law of the case. *Heathcoat v. Potts*, 905 F.2d 367, 370-71 (11th Cir. 1990), *cited favorably in*, *In re DNA Ex Post Facto Issues*, 466 F. App'x 235, 238 (4th Cir. 2012). ("Under the "law of the case" doctrine, the "findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal." *Westbrook v. Zant*, 743 F.2d 764, 768 (11th Cir.1984) (quoting *Dorsey v. Continental Casualty Co.*, 730 F.2d 675, 678 (11th Cir.1984)). This judicially created doctrine, *see generally Litman v. Massachusetts Mutual Life Insurance Co.*, 825 F.2d 1506, 1509–12 (11th Cir.1987), serves several important purposes, including (1) insuring that litigation on an issue will come to an end, (2) discouraging "panel shopping" at the circuit court level, and (3) assuring the obedience of lower courts to the decisions of appellate courts. *Westbrook*, 743 F.2d at 768 n. 6; *see Piambino v. Bailey*, 757 F.2d 1112, 1120 (11th Cir.1985). The doctrine does not extend to every issue that could be ever raised in a given litigation but rather is limited to those issues previously decided; the law is clear, however, that the law of the case doctrine "comprehends things decided by necessary implication as well as those decided explicitly." *Wheeler v. City of Pleasant Grove*, 746 F.2d 1437, 1440 (11th Cir.1984) (per curiam) (emphasis in *371 original; quotation omitted); *Piambino*, 757 F.2d at 1120."). *See also*, *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 332-33, 99 S. Ct. 645, 652, 58 L. Ed. 2d 552 (1979).

> providing Party. In the event no tariff(s) apply, the providing Party's liability shall not exceed an amount equal to the pro rata monthly charge for the period in which such failures, mistakes, omissions, interruptions, delays, errors or defects occur. Recovery of said amount shall be the injured Party's sole and exclusive remedy against the providing Party for such failures, mistakes, omissions, interruptions, delays, errors or defects.  J.A. 531.

Section 26.2 of the states:

> Neither Party shall be liable to the other in connection with the provision or use of services offered under this Agreement for indirect, incidental, consequential, reliance or special damages, including (without limitation) damages for lost profits (collectively, "Consequential Damages"), regardless of the form of action, whether in contract, warranty, strict liability, or tort, including, without limitation, negligence of any kind, even if the other Party has been advised of the possibility of such damages; provided, that the foregoing shall not limit a Party's obligation under Section 25. Notwithstanding the foregoing limitation, a Party's liability shall not be limited by this subsection in the event of its willful or intentional misconduct. J.A. 531.

However, a breach of Verizon's 47 U.S.C. § 251(c) interconnection duties,

such as the breach found by this Court in the Declaratory Judgment Action, is

governed by separate and distinct liability provisions.  Section 27.1 states:

> [Verizon] shall provide the Interconnection and unbundled Network Elements contemplated hereunder in accordance with the performance standards set forth in Section 251(c) of the Act and the FCC Regulations, in particular the rules set forth in 47 Code of Federal Regulations §§ 51.305(a)(3) to (a)(5), 51.311(a) to (c), and 51.313(b).  J.A. 531.

Section 27.3 states:

> The question of what penalties or other action might be appropriate in any situation where [Core] believes, based on a statistically significant number of reports described above, that [Verizon] is not complying with the performance standards referenced in subsection 27.1 above shall be resolved, in the first instance, through negotiations between the Parties and,

15

failing successful negotiations, through the complaint processes of the Commission, the FCC, or a court of competent jurisdiction. [Verizon] agrees to join ACSI in encouraging the Commission to develop expedited procedures for the resolution of any performance-related complaints.  J.A. 532.

Finally, with respect to choice of law, Section 29.5 of the ICA provides:

The construction, interpretation and performance of this Agreement shall be governed by and construed in accordance with the laws of the state in which this Agreement is to be performed, except for its conflicts of laws provisions. In addition, insofar as and to the extent federal law may apply, federal law will control.  J.A. 532.

## SUMMARY OF THE ARGUMENT

Approaching the fourteenth year of this litigation, Core continues its quest to be made whole following Verizon's breach of the ICA in 1999.  Core seeks to have this Court rule that the exculpatory clause in section 26.1 of does not bar Core from being made whole because Maryland law does not allow the application of an exculpatory clause under the circumstances of this case and, as importantly, a plain reading of the exculpatory clause in section 26.1 of the ICA shows that it does not apply here.  Rather, section 27 of the ICA applies to a breach of 47 U.S.C. § 251, which is the breach this Court has already found.  Further, Core seeks to have this Court rule that Verizon is liable, or at a minimum that there is a question of fact regarding the liability, for it tortious conduct and that that conduct was malicious and that Core is entitled to punitive damages.

16

Further, summary judgment generally is inappropriate when matters -- such as knowledge, intent or motive -- that ordinarily are reserved for resolution by the fact-finder are essential elements of the plaintiff's case or of the defense. Here, the District Court erroneously applied a limitation of liability clause because it concluded that, as a matter of law, there was no knowledge, intent or motive in the Defendant's conduct, even though these types of findings are reserved for the fact finder, and not for a court on summary judgment. The Commission made numerous findings of fact in Case 8881, which findings were reviewed and approved by this Court in *Verizon II*, and any remaining factual issues, such as damages, can and should be resolved at trial. The District Court compounded this error by applying this exculpatory clause to a series of events to which the clause had no application, and allowing the clause to be raised belatedly in this litigation even though Defendant waived this defense by not pleading it. We show below that this appeal should be granted.

## ARGUMENT

### I.    Standard of Review

The District Court's orders limiting and dismissing Core's contract and tort claims are reviewed under the standards for summary judgment. "[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

17

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). This Court has found that "[s]ummary judgment is appropriate only if there is no genuine dispute as to any material fact. Under this standard, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. A court considering a summary judgment motion must view the facts in the light most favorable to the non-moving party." *Kim v. Parcel K-Tudor Hall Farm LLC*, 11-2274, 2012 WL 6554884 (4th Cir. Dec. 17, 2012)(internal citations omitted). In addition, where a case "concerns cross-motions for summary judgment, [the Court] considers each motion individually, and [views] the facts relevant to each in the light most favorable to the non-movant." *Id*. Finally, the Court "review[s] de novo both the district court's decision to grant [a] motion for summary judgment and its conclusions of law." *Id*.

## II. The District Court Erred In Reversing Its August 10 Order Finding that Core is Entitled to Actual Damages as a Result of Verizon's Breach of the ICA

The District Court erred in reversing its initial, August 10, 2012 order finding that Core is entitled to actual damages as a result of Verizon's breach of the ICA. The District Court's judgment that Core is entitled to only nominal damages is founded on the court's interpretation of sections 26.1 and 26.2 of the ICA.

18

However, these provisions do not bar Core's claims because: (1) Maryland law, which controls, bars the application of exculpatory clauses like sections 26.1 and 26.2 to intentional conduct; (2) Maryland law bars the application of exculpatory clauses in cases involving common carriers and the public interest; (3) Section 26.1 does not limit damages for Verizon's breach of section 27.1 of the ICA, which has separate remedies that are set out in section 27.3; (4) the plain terms of sections 26.1 and 26.2 relieve Verizon from liability only in connection with services it sells Core, not for Verizon's breach of its statutory duty to interconnect with Core; (5) the Commission has the sole authority to interpret the ICAs it approves; and (6) even assuming sections 26.1 and 26.2 apply to this case, Verizon waived the damages limitation by failing to plead it.

1.    Maryland law bars the application of a damages limitation clause to enable a party to escape liability for its own intentional conduct.[2] "[A] party will not be permitted to excuse its liability for intentional harms or for the more extreme forms of negligence." *Wolf v. Ford*, 335 Md. 525, 531, 644 A.2d 522, 525 (1994). In this case, there is ample evidence in the record to support a finding that Verizon intentionally harmed Core. As has the Commission found in its

---

[2]    Section 26.2 expressly states that "a Party's liability shall not be limited by this subsection in the event of its willful or intentional misconduct." However, sections 26.1 and 26.2 are both exculpatory clauses, and therefore equally subject to the Maryland rule prohibiting limitation of liability for intentional conduct.

proceedings, and as was reviewed in *Verizon I* and *Verizon II*, upon receiving Core's initial request (and multiple follow ups) to use existing facilities to interconnect, Verizon deliberated internally and consciously rejected Core's request, knowing full well the delays this would cause to Core's business. *See generally*, J.A. 332-337; *Verizon I*, at 2-7; and *Verizon II*, at 137-142.

Under the "fact scenario" as found by the Commission, "which is not disputed," "*Verizon wrongfully delayed interconnecting with Core*,,", and "*denied [Core's] request* to use the existing facility by informing Core that the excess capacity was assigned to some "customer of record," *without presenting its concerns* (expressed later during the course of the hearing) that the use of the shared facility would be of "lesser quality" and in violation of the Interconnection Agreement." J.A. 329, 330 (Emphases added).

The Commission made additional findings which demonstrate that Verizon's breach of the ICA was not merely an unintentional or negligent failure to comply, but rather, an intentional course of conduct involving refusals, denials, deception and delay:

- [W]hile *Verizon denied Core the use of the existing facility* stating it was assigned to some "customer of record," the facts later revealed that *Verizon's assignation was in fact to Core* as the unnamed "customer of record," *but this was never revealed to Core* during the period of 1999 when the parties were in discussion. *Id.*, at 6.

20

- [I]nterconnection of Core over the existing facility was proposed by Core and could have been accomplished in an expeditious manner,... but *Verizon refused to do so* until construction of new facilities.... *Id.*

- [W]hile Verizon contends it was required under the parties' Interconnection Agreement to provide the dedicated facility to Core (as shared facilities would not be "equal" under the Agreement according to Verizon), *this concern was never presented to Core* at the time Core requested the interconnection in July and August 1999. *Id.*

- Core specifically requested interconnection within 45 days and also proposed the use of the excess capacity on the existing loop to achieve this timeframe, but *Verizon denied the use of the excess capacity for interconnection. Id.*

- *Verizon refused to offer the use of the existing loop and multiplexer* once Core expressed its interest *and instead denied the use by its assignation to an unnamed customer of record. Id.*, at 7.

- The fact that this customer happened to be Core itself shows *lack of full disclosure by Verizon and failure to deal in good faith*, so that *the record shows improper delay by Verizon in this interconnection...*

- *Verizon wrongfully delayed interconnection with Core* by refusal to interconnect over the existing loop and multiplexer facilities. *Id.* (Emphases added).

These Commission findings, which are no longer susceptible to appeal,[3] establish intent, or at the very least, create a genuine issue of material fact regarding intent in this case.[4] *See Generally* J.A. 327-335.

---

[3]    *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 332-33, 99 S. Ct. 645, 652, 58 L. Ed. 2d 552 (1979)("Since the petitioners received a "full and fair" opportunity to litigate their claims in the SEC action, the contemporary law of collateral estoppel leads inescapably to the conclusion that the petitioners are

In addition to these Commission findings, Core pointed to specific factual evidence of Verizon's harmful intent in its summary judgment papers. In deposition, Core witness Bret Mingo testified, based on his first-hand knowledge and experience dealing with Verizon, that "[h]aving a policy that breaches, that breaches the agreement would be, would be clearly an intent," TJ.A. 202, and "it is Verizon's intent to delay competitors. Every day that the monopoly is preserved is, you know, less product competition, less price competition," J.A. 202; and "I believe the policy was deliberately chosen by the folks who make that decision, those decisions within Verizon, and it is up for the series of Verizon attorneys that we have, we have discussed with over the last 12 years to clean up the mess. And that was a cost of doing business. So, I believe it was intent, yes. That's the point of policy; isn't it?" J.A. 203.[5] The "policy" Mr. Mingo refers to is Verizon's

---

collaterally estopped from relitigating the question of whether the proxy statement was materially false and misleading.").

[4]    For example, the term "wrongful"—used by the Commission repeatedly— is synonymous with "malice." Ihnken v. Gardner, CCB-11-3508, 2013 WL 772955 (D. Md. Feb. 27, 2013).

[5]    These passages are included in an excerpt from the deposition which Verizon attached to its Cross Motion for Partial Summary Judgment (Doc. 52), as Exhibit B, and were referenced by Core in its Reply to Verizon's Opposition to Core's Cross Motion for Partial Reconsideration (Doc. 72), at 1-2.

internal policy of refusing to use existing facilities for interconnection, which the Commission has condemned repeatedly over the years.[6]

Core also referenced the pre-filed written testimony of its witnesses, Bret Mingo, Todd Lesser and Douglas Dawson before the Commission, as well the testimony of Commission Staff witness Steve Molnar, on the issue of Verizon's intent, in its Opposition to Verizon's Motion for Summary Judgment. J.A. 357-467. Mr. Mingo testified that "Verizon's "policy" of using only dedicated physical facilities for interconnection purposes is simply an ad-hoc device, used strategically to delay the initial interconnection process." J.A. 363, 364.

Mr. Dawson testified:

Verizon policy amounts to – they have set aside all existing field facilities by declaring them to be "retail" and have thus created a requirement that a CLEC must wait for the slow construction of new facilities, even when existing facilities already exist that would meet the purpose. This Verizon policy seems like nothing more than another of Verizon's delaying tactics to me. As one who has negotiated numerous interconnections I have seen a constantly shifting series of Verizon excuses and policies that seem like nothing more than pure excuses to make interconnection as difficult as

---

[6]    *See*, Letter Order, *In the Matter of the Review By the Commission Into Verizon Maryland Inc.'s Compliance with the Conditions of 47 U.S.C. §271(c)*, Md. P.S.C. Docket No. 8921, at 6 (Dec. 16, 2002)(J.A.___)(referring to Verizon's "policy" on existing facilities as a "barrier to competition," and directing Verizon to eliminate the policy.); *and see*, Order 85024, *In the Matter of the Complaint of Core Communications, Inc. vs. Verizon Maryland, Inc.*, Md. P.S.C. Case No. 9005 (July 13, 2012)(J.A.___), at 20 ("Verizon failed to cooperate in good faith, thereby preventing a more timely interconnection with Core" in Salisbury, Maryland); *and*, at 24 ("the Commission finds that Verizon wrongfully delayed interconnecting with Core at Mount Airy, which delay violated the standards of the parties" ICA in contravention of that agreement.")

23

possible. This is just one more "policy" in a much larger series of such policies that seem to serve no purpose but to slow CLECs from getting into business. J.A. 384, 385.

Mr. Molnar testified:

Any incumbent carrier, including Verizon, has an incentive to delay the market entry of its potential competitors. The sooner competitors enter the market, the sooner Verizon loses revenue that it would otherwise receive itself. Conversely, if the entry of competitors can be delayed, then revenue that Verizon would lose could be maintained at least until the competitor actually begins operating. Moreover, every day that a carrier cannot operate and provide service to customers is a day in which costs are incurred that are not offset with revenue. These conditions add to the financial burden of new CLECs and make it more difficult for CLECs to become viable going concerns over time. Any ILEC would have an incentive to create or promote these conditions if regulatory safeguards did not intervene.

It is also in the interest of incumbent carriers to delay market entry of competitors in order to either maintain existing customers or attract new ones. For example, If a business is considering obtaining service from a carrier other than the business' current provider, the incumbent has a substantial advantage in attracting the customer if can provide service in 30 days whereas a competitor cannot deliver service for several months. Incumbent service providers in any industry benefit from the delay of competitors into the marketplace. J.A. 459, 460.

The record shows that Verizon's conduct (or misconduct) was both intentional and harmful. Accordingly, the District Court's finding that "Core has put forth no evidence to show that Verizon intended to breach the ICA…," August 8, 2010 Memorandum, at 6, is clearly erroneous and is grounds for reversal.

2.     Under Maryland law, "public policy will not permit exculpatory agreements in transactions affecting the public interest… This last category includes the performance of a public service obligation, e.g., public utilities…"

24

*Wolf*, 335 Md., at 532. Verizon's wrongful interconnection delay clearly implicates "the performance of a public service obligation," i.e., the federal statutory obligation to interconnect according to standards that were incorporated into the ICA that was reviewed and approved by the Commission. Verizon's unlawful interconnection delay thus not only harmed Core, but also infringed on important public policy objectives.

As this Court previously found:

> [T]he Act creates a framework for the development of facilities-based competition in which ILECs are required to interconnect their networks with the networks of requesting CLECs. This interconnection ensures that consumers of local telephone service may communicate with consumers who are served by a different LEC." J.A. 136.

Indeed, the District Court found that "[t]he relationship between Core and Verizon, formed pursuant to the policies and purposes behind the Telecommunications Act, supports application of the public interest exception," J.A. 633. "While Core is not itself a consumer in the conventional sense, it furthers the interest of private consumers by interconnecting with Verizon and increasing competition in the market."[7]

---

[7]     *Id*. The court found that "section 26 is not enforceable to the extent that it is an *exculpatory* provision shielding Verizon from tort liability because the transactions between Core and Verizon affect the public interest. However, the limitation of liability clause contained in section 26 may well be enforceable under Maryland law as a defense to Core's contract claim" Doc. 66, at 15. The District Court did not explain why its analysis of section 26 differed in this respect.

25

While these interconnection obligations are federal in origin, the Commission has made it clear that it shares those same objectives, and that it views Verizon's "wrongful[] delay[]," as damaging the public interest. J.A. 331. The Commission stated below that "[t]he PSC, which is responsible for approving ICAs and regulating telecommunications within the State of Maryland views Verizon's failure to interconnect with Core in a timely manner as *a threat to competitiveness within the state's telecommunication industry* and *an affront to Section 251 and of the FCC's Local Competition Order*." Opposition of the Maryland Public Service Commission and Its Commissioners to Plaintiff's Motion for Summary Judgment, Doc. 50 (Aug. 12, 2011), at 3. In sum, Verizon "unjustifiabl[y] delay[ed]" federally-mandated and state-supervised facilities-based interconnection with Core. J.A. 642.    In these extraordinary circumstances, Verizon cannot be permitted to hide behind exculpatory clauses such as sections 26.1 and 26.2.[8]

The District Court's finding that "the FCC at least implicitly found that exculpatory clauses... are not void under the Telecommunications Act," J.A. 664, is a red herring. The issue here is whether Verizon may hide behind such a clause

---

[8]    Core has never argued that section 26 cannot be enforced in any instance. There are violations of the ICA which do not implicate Verizon's seminal duty to interconnect as set forth in section 251 of the Act and section 27.1 of the ICA (for example, any and all violations of the ICA's commercial terms) or otherwise implicate state or federal public policy.

26

in the face of Maryland law, which by virtue of section 29.5 of the ICA, governs, and which voids such clauses in cases involving intentional conduct or the public interest, and the specific facts in this case, which establish that Verizon did act intentionally, and did injure the public interest.

The two FCC rulings Verizon cited below,[9] and which the District Court apparently relied upon, do not establish a generally applicable "federal law" which would override section 29.5's application of Maryland law to the "construction, interpretation and performance" of section 26 in this case. Both cases were of limited precedential value. The brief passage Verizon referenced from the 1996 *Local Competition Order* simply set ground rules for negotiation of ICAs in the first instance, and has no application whatsoever to the construction, interpretation or performance of a limitation of liability clause in a Commission-approved ICA which is explicitly governed by Maryland law.[10]

---

[9]     *See*, Doc. 66, 3-7; and Doc. 71, at 4-6.

[10]    First Report and Order, *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd 15499, ¶ 152 (1996) ("*Local Competition Order*") (subsequent history omitted)("We reject the general contention that a request by a party that another party limit its legal remedies as part of a negotiated agreement will in all cases constitute a violation of the duty to negotiate in good faith. A party may voluntarily agree to limit its legal rights or remedies in order to obtain a valuable concession from another party. In some circumstances, however, a party may violate this statutory provision by demanding that another waive its legal rights.").

The FCC's 2003 order in *Cavalier* was issued well after the ICA here was entered into and indeed well after the facts in this case had come to pass. *Cavalier* involved the FCC Wireline Competition Bureau's arbitration of disputed ICA terms for Cavalier Telephone LLC and Verizon Virginia Inc. for the state of Virginia, following the Virginia State Corporation Commission's refusal to do so, and is replete with party-specific issues and arguments which defy any streamlined understanding.[11] Moreover, there is nothing in *Cavalier* to suggest that, in fashioning a limitation of liability clause between two specific carriers, the FCC intended to enunciate a generally applicable federal rule.[12] Indeed, the FCC's

_____

[11] *See*, Memorandum Opinion and Order, *Petition of Cavalier Tel. LLC Pursuant to Section 252(e)(5) of the Communications Act for Preemption of the Jurisdiction of the Virginia State Corporation Commission Regarding Interconnection Disputes with Verizon Virginia Inc. and for Arbitration*, 18 FCC Rcd 25887, ¶ 1 n.3 (WCB 2003)("*Cavalier Order*").

[12] *See generally*, *Cavalier*, ¶¶ 180-183. Courts recognize that not every ICA arbitration issue arises out of the Act. *Coserv Ltd. Liab. Corp. v. Sw. Bell Tel. Co.*, 350 F.3d 482, 487 (5th Cir. 2003) ("[C]ompulsory arbitration under § 252 begins with a request by a CLEC to negotiate with an ILEC regarding its obligations under § 251. An ILEC is *required* by the Act to negotiate about those duties listed in § 251(b) and (c). During negotiations, however, the parties are free to make any agreement they want without regard to the requirements of § 251(b) and (c). To that extent, the parties are free to include interconnection issues that are not listed in § 251(b) and (c) in their negotiations. If the voluntary negotiations result in only a partial agreement, or in no agreement at all, either party can petition for compulsory arbitration of any open issue.

There is nothing in § 252(b)(1) limiting open issues only to those listed in § 251(b) and (c). By including an open-ended voluntary negotiations provision in § 252(a)(1), Congress clearly contemplated that the sophisticated telecommunications carriers subject to the Act might choose to include other issues

28

conclusion, that Cavalier's proposed language was "commercially unreasonable" was based on a finding that it "would eviscerate any limitations on liability Cavalier agrees to elsewhere in the agreement,"[13] not on any interpretation of any provision of the Act. Given this, there is simply no reasoned principle of law applicable to the interpretation, construction or performance of the ICA in this case, in either of the cases which Verizon relies upon, to which the Court might defer.

      3.    The District Court's application of section 26.1 as a limitation on Core's damages runs afoul of the plain language of section 26.1 itself, which begins: "[e]xcept as may be provided pursuant to Section 27 below…,"  which clearly shows that section 26.1 is not intended to limit damages for a breach of section 27. J.A. 653. This is a significant exclusion, since this Court found that Verizon breached section 27.1 of the ICA (which has its own remedy in section 27.3) not that it breached any portion of the ICA that is limited in damages by section 26.1 of the ICA. The Court found that ". . . Section 27.1 of the ICA quite plainly states that Verizon "shall provide the Interconnection and unbundled Network Elements contemplated hereunder in accordance with the performance standards set forth in Section 251(c) of the Act and the FCC Regulations." J.A.

---

in their voluntary negotiations, and to link issues of reciprocal interconnection together under the § 252 framework.
[13]   *Id.*, at ¶ 183.

150. Based on this, this Court found that "Verizon had a duty to provide Core with the requested interconnection and therefore breached its contract." *Id.*

The ICA has an independent penalty section for breaches of section 27.1, at section 27.3, which states "The question of what penalties or other action might be appropriate in any situation where [Verizon] is not complying with the performance standards referenced in subsection 27.1 above shall be resolved… through the complaint processes of the Commission, the FCC, or a court of competent jurisdiction." J.A. 653.

Core did file complaints with the Commission and with a court of competent jurisdiction[14] in order to determine the appropriate remedy for the breach. The Court has guided the District Court on this issue by mandating "a determination of damages." J.A. 152.

4.      The District Court's application of sections 26.1 and 26.2 to the facts in this case contradicts the plain language of those sections for a second reason, which is that both sections address Verizon's liability in connection with services it sells Core, not with Verizon's statutory interconnection obligations. Section 26.1 limits liability of a "providing Party" to "the pro rata monthly charge for the period in which such failures… occur." J.A. 653. Section 26.2 limits liability "in connection with provision or use of services." *Id.* However, this case does not

involve Verizon's failure to provide services to Core. Rather, it involves Verizon's breach of its statutory and regulatory duty to interconnect with Core, as those standards are incorporated into section 27.1 of the ICA. Federal case law holds that "interconnection" is not a "service." *Global Naps, Inc. v. Bell Atl.-New Jersey, Inc.*, 287 F. Supp. 2d 532, 547 (D.N.J. 2003)("In the provisions of the 1996 Act that Verizon allegedly has violated, it does not appear that providing interconnection to a competitor satisfies the definition of "telecommunications services" for purposes of § 153(44)").[15] Because this case involves interconnection, and not the provision of any service by Verizon to Core, section 26.1 and 26.2 are simply inapplicable by their own terms.

     5.    Verizon's argument that sections 26.1 and 26.2 limit Core's damages fails because, even if the Fourth Circuit's ruling and the plain language of the ICA did not clearly foreclose Verizon's argument, the Maryland Commission has the

---

[14]    Core did so by filing its 1999 complaint at the Commission as well as by filing the current damages complaint in Maryland state court.

[15]    In a seminal case interpreting the FCC's initial rules implementing the Telecommunications Act of 1996, the Eighth Circuit reviewed the FCC's finding "that the term 'interconnection' under section 251(c)(2) refers only to the physical linking of two networks for the mutual exchange of traffic..." *Competitive Telecommunications Ass'n v. F.C.C.*, 117 F.3d 1068, 1071 (8th Cir. 1997) In upholding that FCC finding, the court rejected the argument that "Congress intended interconnection to be more than mere physical access and that the definition of the term should include transmission and routing services as well," *id.*, and concluded that "[t]he FCC's interpretation of interconnection as only a physical link for mutual exchange of traffic between LECs does not violate the Act. *Id.*, at 1072.

sole authority to interpret and enforce the ICA and Verizon failed to request an interpretation of section 26.1 or 27.1 from the Commission, even though it had ample opportunity to do so. *See* J.A. 275-306. As stated by the Third Circuit Court of Appeals, "every federal appellate court to consider the issue has determined or assumed that state commissions have the authority to hear interpretation and enforcement actions regarding approved interconnection agreements, despite the Act's silence on that point." *Core Communications, Inc. v. Verizon Pennsylvania, Inc.* 493 F.3d 333 (3rd Cir. 2007) *citing P.R. Tel. Co. v. Telecomms. Regulatory Bd.,* 189 F.3d 1, 10–13 (1st Cir.1999); *Bell Atl. Md., Inc. v. MCI WorldCom,* 240 F.3d 279, 304 (4th Cir.2001), *vacated on other grounds in Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002); *Sw. Bell Tel. Co. v. Pub. Util. Comm'n of Tx.,* 208 F.3d 475, 479–80 (5th Cir.2000); *Ill. Bell Tel. Co. v. Worldcom Techs., Inc.,* 179 F.3d 566, 573 (7th Cir.1999); *Iowa Utils. Bd. v. FCC,* 120 F.3d 753, 804 (8th Cir.1997), *reversed in part on other grounds, Iowa Utils. Bd.,* 525 U.S. at 385, 119 S.Ct. 721; *Sw. Bell Tel. Co. v. Brooks Fiber Commc'ns of Okla., Inc.,* 235 F.3d 493, 497 (10th Cir.2000); *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., Inc.,* 317 F.3d 1270, 1278 (11th Cir.2003) (*en banc* ). "As Verizon points out, a state commission's authority to approve or reject an interconnection agreement (based on its compliance with federal law) would itself be undermined if the

commission lacked the authority to determine in the first instance the meaning of the agreement it has approved." *Verizon Maryland Inc. v. RCN Telecom Services, Inc.*, 232 F. Supp. 2d 539, 551 (D. Md. 2002) *aff'd in part, dismissed in part sub nom. Verizon Maryland, Inc. v. Global NAPS, Inc.*, 377 F.3d 355 (4th Cir. 2004). An aggrieved party has a private right of action in federal court to review a decision only after a state agency has ruled. *See, id.* Despite being apprised of Core's intent to seek damages since at least 2002 (when Core filed its complaint with the District Court in this case), Verizon has never asked the Commission to interpret or enforce the very ICA provisions with which it seeks to escape liability, and the appropriate time for Verizon to do so has long since passed.

6.     Even if section 26.1 of the ICA applied to the damages sought in this case, it is an avoidance that Verizon has waived by failing to plead. "In responding to a pleading, a party must affirmatively state any avoidance . . ." Rule 8(c) F.R.Civ.P. A provision limiting damages is an avoidance and must be plead affirmatively. *See Westfarm Associates Ltd. P'ship v. Int'l Fabricare Inst.*, 846 F. Supp. 439, 440 (D. Md. 1993) *aff'd sub nom. Westfarm Associates Ltd. P'ship v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669 (4th Cir. 1995) ("Generally, the failure to plead an affirmative defense results in the waiver of that defense and its exclusion as an issue in the case." *Id.* The Fourth Circuit has said that the "waiver is not automatic, requiring a showing of prejudice or unfair surprise.");

33

*Peterson v. Air Line Pilots Ass'n, Int'l*, 759 F.2d 1161, 1164 (4th Cir. 1985). However, after espousing the requirement of a showing of prejudice or unfair surprise, the *Peterson* court went on to rule that defendant had waived its right to assert the affirmative defense of a statute of limitations by waiting three years to assert the defense. *Id.*

In this case Verizon has been far more dilatory in asserting the avoidance it purports is provided by sections 26.1 and 26.2 of the ICA. Core first brought its claims against Verizon in the Petition to the Maryland Commission on or about October 8, 1999 and amended that Petition on January 8, 2001. Verizon did not answer until a little more than a year and a half later on or about May 4, 2001. In its Answer Verizon did not request that the commission rule any provision of the ICA limiting damages, as it was required to do, or raise as a defense any provision of the ICA limiting damages, though it did raise as defenses that Core had failed to allege any economic injury and the force majeure clause of the ICA, J.A. 304, indicating that Verizon knew both that economic damages would be an issue and that the Maryland Commission was the proper body to interpret the ICA.

Core then filed the complaint in this case in Maryland state court on or about August 22, 2002, alleging economic damages. Verizon removed that case from Maryland state court to the District Court on or about September 27, 2002 and filed its "Answer and Affirmative Defenses" on or about October 4, 2002. J.A. 53. The

34

caption of the pleading indicates that Verizon was aware that Rule 8(c) F.R.Civ.P. required it to affirmatively state any avoidance or affirmative defense. In its "Answer and Affirmative Defenses," Verizon stated eleven affirmative defenses including the force majeure clause of the ICA and failure to mitigate damages, but it did not plead any damages limitation clause of the ICA.  J.A. 62, 63.  The damages case was stayed on January 8, 2003 pending the outcome of Case 8881. The Commission ruled against Verizon on or about February 27, 2004. Verizon filed a Petition for Reconsideration and Rehearing on or about April 4, 2004 and did not assert or request that the Maryland Commission interpret or enforce any damages limitations clause in that Petition. J.A. 336.

On February 25, 2008, exactly four years after the Maryland Commission ruled, Verizon filed its Complaint in the Declaratory Judgment action. That Complaint alleged several errors by the Maryland Commission in interpreting the ICA but did not make any allegations regarding any damages limitation clause in the ICA.  On or about October 13, 2011 the damages case was reopened. The Court set a fact discovery deadline of December 16, 2011. Only after the fact discovery deadline had passed and Core moved to dismiss its equitable claims and its claim that Verizon breached the implied duty of good faith in the ICA (as distinct from and in addition to Verizon's breach of section 27.1 of the ICA) because these issues were now moot, did Verizon raise the damages limitation

issue for the first time.  Verizon did so on December 28, 2011, twelve years after Core filed its complaint with the Maryland Commission, and nine years after Core's complaint and Verizon's "Answer and Affirmative Defenses" in the damages case. This Court ruled in *Peterson* that the defendant could not raise the affirmative defense limitations because of a three-year delay in which both parties proceeded as if it was not an issue. *See Peterson v. Air Line Pilots Ass'n, Int'l*, 759 F.2d 1161, 1164 (4th Cir. 1985).  Based on that reasoning Verizon should be denied the opportunity to raise an affirmative avoidance pursuant to any damages limitation clause in the ICA nine years after it filed eleven different affirmative defenses without mentioning a damages limitations clause.

Even if the Court were to ignore the nine year failure to raise the affirmative avoidance of a damages limitation clause, Verizon should be denied the opportunity to raise it now because it would be an unfair surprise to and prejudice Core.  As stated above, Verizon waited until the discovery period had run and Core, based on the defenses and evidence already developed over *eleven years of litigation* agreed to dismiss its equitable claims and moved to dismiss its claim that Verizon breached the ICA's implied covenant of good faith.  Had Verizon pled the damages limitation clause nine years ago, as it should have, Core would not have moved to dismiss its equitable claims on the theory that if its legal claims are barred Verizon should not benefit from its actions.  Further, a party may not rely

36

on an exculpatory clause if it breaches the contract in bad faith.  *See, PC COM, Inc. v. Proteon, Inc.*, 946 F.Supp. 1125 (S.D.N.Y 1996).  Last, had Core known that Verizon was going to assert this defense nine years ago, or prior to 30 days before the discovery deadline, Core could have conducted discovery to more fully develop all of the issues above.

### III.    The District Court Erred in Dismissing Core's Tort Claims

### 1.    Unfair Competition

This District Court erred in granting Verizon Summary Judgment on the cause of action for Unfair Competition because the facts as found by this Court in connection with its ruling that Verizon breached its contract with Core show that Verizon did not deal with Core on the basis of common honesty and fairness without the taint of fraud or deception.  Maryland law recognizes the tort of Unfair Competition.  See *Baltimore Bedding Corp. v. Moses*, 182 Md. 229, 34 A.2d 338 (1943). As Judge Gabris has recently pointed out,

> "The doctrine of unfair competition is described in *Baltimore Bedding Corp. v. Moses*, 34 A.2d 338 (Md. 1943). It established that the purpose of the doctrine was to prevent dealings based on deceit and dishonesty, and it sets out the doctrine as follows:
>
> [W]hile [unfair competition law] encourages fair trade in every way and aims to foster, and not to hamper, competition, no one, especially a trader, is justified in damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort.... What constitutes unfair competition in a given case is governed by its own particular facts and circumstances. Each case is a law unto itself, subject, only, to the general principle that all

37

dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception. *Baltimore Bedding*, 34 A.2d at 342.

*Victor Stanley, Inc. v. Creative Pipe, Inc.*, Civ. No. MJG-06-2662, 2011 (D.Md.. Sept. 30, 2011)

In this case the facts as found by this Court make it clear that Verizon engaged in deceit and dishonesty from the moment they entered into the contract with Core as follows:

A.    On July 27, 1999, Core sent a letter to Verizon requesting an activation date of September 10, 1999. The letter stated, "[p]lease confirm in writing if the requested interconnection activation date is acceptable, or, if it is not acceptable, please propose an alternate date, together with an explanation why such alternate date is appropriate." *Verizon did not respond in writing.* J.A. 139.

B.    At a meeting on August 11, 1999, the parties agreed to use the "entrance facility" method of interconnection. Core requested interconnection with Verizon at its Wire Center on the tenth floor of the Court Square building in Baltimore, Maryland. That floor of the building was "on-net" with Verizon, meaning that it was physically connected to Verizon's central network through fiber feeder cables and an OC-12 multiplexer (hereinafter "OC-12 Mux"). Verizon had turned on an OC-12 Loop Ring at the building in June 1999, meaning that physical construction was complete, the optical signals were transmitting, and the

38

ring was service-ready. At some point, however, *the OC-12 Mux was disconnected from the OC-12 Loop Ring.* J.A. 139.

C.    On August 15, 1999, *Verizon informed Core that the OC-12 Mux had been "assigned" to some "customer of record", the identity of whom Verizon would not disclose.* Thus, Verizon claimed that the OC-12 Mux was unavailable for interconnection. *Later, Verizon admitted that Core was the customer of record for the OC-12 Mux.* J.A 140.

D.    On August 31, 1999, *Verizon informed Core that, as a matter of policy, it would not use the OC-12 Loop Ring for interconnection, whether or not it was technically feasible.* J.A. 141.

E.    Core met with Verizon again on September 9, 1999, to express its desire to use the OC-12 Loop Ring already in place for interconnection. As a result of the meeting, *Verizon informed Core that it would not do that despite the technical feasibility and would instead complete construction of the New OC-12 IOF Ring* and establish connection to the Wire Center by November 16, 1999. Core responded on September 24, 1999, that the November 16 date was not acceptable, and that Verizon had not yet articulated a reasonable justification for refusing to use the existing OC-12 Loop Ring for interconnection. J.A. 141.

F.    *Verizon never articulated a reasonable justification for refusing to use the existing OC-12 Loop Ring* for interconnection. J.A. 141.

39

G.    Despite Verizon's promise to have the New OC-12 IOF Ring established and connected to the Wire Center by November 16, 1999, Core was not interconnected until December 23, 1999. J.A. 142.

H.    Verizon knew it was delaying Core's entry into the telecommunications marketplace, and damaging Core's business, because Core's forecasts, attached to the July 27, 1999 letter, indicate an immediate need for capacity. J.A. 138.

These facts establish that Verizon, a trader of telecommunications services, intentionally jeopardized (and did harm as was established by Core's expert's report) Core's business through the means of deceit, trickery and unfair methods by refusing initially to return communications to Core, by refusing to connect Core to an immediately available and technically feasible connection, and by lying to Core that some "customer of record" had been assigned the connection when that "customer of record" was Core.

Though the Maryland Courts have often used Unfair Competition as a poor man's trademark infringement where one business was trading on a name or product confusingly similar to a competitor's, that is not required. Unfair Competition extends to "all cases of unfair competition in the field of business" and the rationale of the law is that "no one, especially a trader, is justified in damaging or jeopardizing another's business by fraud, deceit, trickery or unfair

methods of any sort." *Electronics Store, Inc. v. Cellco Partnership*, 732 A.2d 980 (1999) citing *Baltimore Bedding Corp. v. Moses*, 182 Md. 229, 34 A.2d 338 (1943). "It is not limited to "passing off" one's own goods as those of a competitor." *Delmarva Sash & Door Co. of Maryland, Inc. v. Andersen Windows, Inc.,* 218 F.Supp.2d 729 (D.Md Aug. 30 2002), citing *GAI Audio of New York, Inc. v. Columbia Broadcasting System, Inc.,* 27 Md.App. 172, 340 A.2d 736, 747 (1975). Verizon cannot say that Unfair Competition does not apply to this case because they were not competing with Core in the marketplace when Verizon's own actions were calculated to, and did, keep Core from the marketplace. As Judge Gabris said, noting Judge Connelly's opinion in *Translucent Commc'ns LLC v. Americas Premier Corp.*, Civ. No. WGC-08-3235 (D.Md. Feb. 24, 2010), "although the doctrine of unfair competition was originally applicable only to trademark cases, it is no longer limited to a particular kind of business activity, but each case is a law unto itself subject only to the general principle of old-fashioned honesty." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, Civ. No. MJG-06-2662, 2011 (D.Md.. Sept. 30, 2011).

## 2.     Concealment

This District Court erred in granting Verizon Summary Judgment on the cause of action for Concealment because the facts as found by this Court in its finding that Verizon breached its contract with Core show that Verizon knew that

41

Core was the "customer of record" "assigned" to the facilities that Core requested and withheld that information with the intent to deceive Core.

Concealment requires five elements: (1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment. *Rhee v. Highland Development Corporation, et al.*, 958 A.2d 385, 182 Md.App. 516 (Md.App. 2008). In the case of Concealment, Maryland law notes ". . . concealment must have been intentional and effective-the hiding of a material fact with the attained object of creating or continuing a false impression as to that fact. The affirmative suppression of the truth must have been with *intent* to deceive." *Id*

In this case the facts as found by this Court make it clear that Verizon engaged in deceit and dishonesty from the moment they entered into the contract with Core as follows:

A.    On August 15, 1999, *Verizon informed Core that the OC-12 Mux had been "assigned" to some "customer of record," the identity of whom Verizon would not disclose.* Thus, Verizon claimed that the OC-12 Mux was unavailable for interconnection. *Later, Verizon admitted that Core was the customer of record for the OC-12 Mux.* J.A. 139.

42

B.    *On August 31, 1999, Verizon informed Core that, as a matter of policy, it would not use the OC-12 Loop Ring for interconnection, whether or not it was technically feasible. Verizon further explained on September 7, 1999, that it had previously classified the existing OC-12 Mux as a "customer" facility, rather than a "carrier" facility and that the OC-12 Mux would need to be "reinventoried" as a "carrier" facility in order to use it for interconnection.* Instead of using the existing facilities, Verizon stated that it would need to physically detach the OC-12 Mux from the OC-12 Loop Ring, construct a new OC-12 ring interoffice facility ring ("New OC-12 IOF Ring"), and insert the multiplexer into the new ring before subsequent steps in the interconnection process could take place. J.A. 141.

Based on these facts it is clear that Verizon had a duty, both under the contract as found by this Court and under the Act,[16] to inform Core that it had set aside the existing OC-12 Mux for Core as the "customer of record." Verizon failed to disclose that fact and instead told Core that it could not use the connection because of the "customer of record," and refused to disclose who that customer

---

[16]    47 C.F.R. § 51.305(g). ("An incumbent LEC shall provide to a requesting telecommunications carrier technical information about the incumbent LEC's network facilities sufficient to allow the requesting carrier to achieve interconnection consistent with the requirements of this section.).

43

was, Verizon then disconnected the OC-12 Mux.  The deception perpetrated by Verizon caused a delay in Core's interconnection. The Telecommunications Act of 1996 "was designed to enable new Local Exchange Carriers to enter local telephone markets with ease and to reduce monopoly control of these markets and increase competition among providers." *Verizon Maryland, Inc. v. Core Communications, Inc.*, 405 Fed.Appx. 706 (4th Cir. 2010) citing *Verizon Communications Inc. v. FCC,* 535 U.S. 467, 489, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002); 47 U.S.C. § 251 *et seq.* "The Supreme Court has provided the Circuit Courts with guidance about the purpose of the Act: "The 1996 Act both prohibits state and local regulation that impedes the provision of 'telecommunications service,' § 253(a), and obligates incumbent carriers to allow competitors to enter their local markets, 47 U.S.C. § 251(c)." *Verizon*, 535 U.S. at 492, 122 S.Ct. 1646. Additionally, the Act is designed to "address the practical difficulties of fostering local competition." *Id.*" *Verizon Maryland, Inc. v. Core Communications, Inc.*, 405 Fed.Appx. 706 (4th Cir. 2010)

Core justifiably relied on Verizon's statement that Core could not interconnect to the OC-12 Mux because of the "customer of record" issue and continued to negotiate with Verizon for interconnection to the OC-12 Loop-Ring,

which was refused by Verizon.[17]  Core's reliance was justifiable because Core had

met with a Verizon representative, Sylvia Talbert, who told them that the

"customer of record" was a party other than Core, but would not say who and Core

wrote a letter to Verizon on August 20, 1999 Verizon's position and stating that

Core would work to identify the existing customer of record.  J.A. 470.  Had

Verizon not been deceitful Core could have demanded immediate connection to the

existing OC-12 Mux, which in reality had already been assigned to Core.  Core

---

[17]     The District Court's finding that "there is a sound basis for inferring that Verizon's wholesale and retail divisions were highly separated and that Verizon's wholesale division, which Core worked with to interconnect, did not, in fact, know the identity of the customer of record," Doc. 66, at 10 is purely speculative. Core witness Bret Mingo testified in deposition that the customer of record could have been Core or another carrier, but if it was Core, he was "mystified" and "perplexed" as to why Verizon would not simply use the multiplexer immediately, as Core had requested. Depo. Tr., 259, 9; 260,4; and 264, 15:22.By ignoring this testimony, and "inferring" facts in the light most favorable to the movant, Verizon, the District Court improperly ruled against Core in violation of the rules for summary judgment. In addition, the District Court misread section 222 of the Act. That provision is intended to prohibit certain *marketing practices*, and does not restrict Verizon's internal divisions from sharing information to enable interconnection with Core. It provides that "[a] telecommunications carrier that receives or obtains proprietary information from another carrier for purposes of providing any telecommunications service shall use such information only for such purpose, and shall not use such information for its own marketing efforts. 47 U.S.C.A. § 222(b). Further, the FCC's rules implementing this provision state that "[i]f a telecommunications carrier provides different categories of service, and a customer subscribes to more than one category of service offered by the carrier, the carrier is permitted to share CPNI among the carrier's affiliated entities that provide a service offering to the customer." 47 C.F.R. § 64.2005.

45

suffered damages to be set out in Core's Expert's opinion and determined by the court. However the Fourth Circuit made it clear that "[a]ccording to the Commission, delays in interconnection are very costly to a new provider because it "cannot operate and earn revenue while it continues to incur expenses." Delays can benefit the ILEC by reducing the chances that the CLEC is successful." *Id.*

### 3.    Intentional/Negligent Misrepresentation

Core conceded at the District Court that neither Intentional or Negligent Misrepresentation applies to this case because, even though Verizon's statement that there was a "customer of record" was intended to deceive Core and impede Core's interconnection thereby robbing Core of its ability to earn revenue and reducing the chances that Core would be successful, the statement, standing alone, could be construed as not false.

## CORE'S TORT CLAIMS ARE ALLOWED UNDER MARYLAND LAW

Core may sustain and prevail on its tort claims, and therefore recover punitive damages, along with compensatory damages for the breach of contract. Verizon has suggested that Core may not prevail on tort claims because of the contract between Core and Verizon. It is understandable that Verizon would like this to be true in light of its intentional and malicious behavior in this case. However, not only does Maryland now allow tort actions in contract cases, this is not new law and dates back to the common law of England. "Although the doctrine

46

of punitive damages has been associated traditionally with the field of torts, the award of such damages has been sought not infrequently in contract-related cases. . . . such damages are recoverable in tort actions arising out of contractual relationships." *H & R Block, Inc., et al. v. Testerman,* 275 Md. 36, 338 A.2d 48 (Md. 1975). The *H & R Block* decision notes and relies on "*Knickerbocker Co. v. Gardiner Co.,* 107 Md. 556, 569-70, 69 A. 405, 410 (1908), "the landmark Maryland case in this area. . ." *Id.* *Knickerbocker,* in turn relies on the English case of *Lumley v. Guye,* 2 E. & B. 216, 118 Eng. Rep. 749 (K.B. 1853).

This Court has agreed that this is the law in Maryland stating that punitive damages are recoverable ""in tort actions arising out of contractual relationships." *Testerman,* 338 A.2d at 53; *Horan,* 412 A.2d at 416-17. A tort "arises out of a contractual relationship" when "the tortious conduct and the contract [are] so intertwined that one [cannot] be viewed in isolation from the other." *General Motors Corp. v. Piskor,* 281 Md. 627, 381 A.2d 16, 21 (1977); accord, *Horan,* 412 A.2d at 417." *Saval v. BL, LTD,* 710 F.2d 1027 (4th Cir. 1983). The Maryland Court of Appeal has further explained that "[p]erhaps the clearest applications of the *Testerman* principle occur when the plaintiff and the tortfeasor are in privity and the conduct of the tortfeasor may properly be pleaded alternatively (whether or not actually pleaded), as a breach of contract and as a tort. For example, in *Testerman,* the claim against the defendant, a tax return preparation service, could

47

have been properly pleaded, and was pleaded, both as a breach of the contract to prepare plaintiffs' returns and as a negligent performance of the duty assumed to prepare returns." *Miller Building Supply, Inc. v. Rosen*, 305 Md. 341, 503 A.2d 1344 (Md. Ct. App. 1986).

## MALICE

Based on Maryland law it is patent that Core may claim and prevail on tort actions along with its breach of contract action and recover punitive damages. "The remedies generally available to a plaintiff who has established unfair competition include injunctive relief, compensatory damages and punitive damages." *GAI Audio of New York, Inc. v. Columbia Broadcasting Systems, Inc.*, 340 A.2d 521, 27 Md.App. 172 (Md.App 1975). However, "[i]n Maryland, in order to obtain an award of punitive or exemplary damages, it has been held that a plaintiff must prove actual malice or its legal equivalent. *H & R Block, Inc., et al. v. Glenn B. Testerman, et ux., supra; Seigman v. Equitable Trust Co.*, 267 Md. 309, 315, 297 A.2d 758 (1972). The legal equivalent of actual malice is, as Judge Levine pointed out in *Testerman*, frequently labeled implied malice. The Maryland Court of Appeals in *Drug Fair v. Smith*, 263 Md. 341, 352, 283 A.2d 392, 398 (1971) defined actual malice in the following terms: 'Actual or express malice may be characterized as the performance of an unlawful act, intentionally or wantonly, without legal justification or excuse but with an evil or rancorous motive

influenced by hate; the purpose being to deliberately and willfully injure the plaintiff.'" *Id.*

Based on the facts and law as found by this Court and stated above, it is patently clear that Verizon well knew that "delays in interconnection are very costly to a new provider because it "cannot operate and earn revenue while it continues to incur expenses." Delays can benefit the ILEC by reducing the chances that the CLEC is successful." *Verizon Maryland, Inc. v. Core Communications, Inc.*, 405 Fed.Appx. 706 (4th Cir. 2010). It may be possible to believe that, with the exception of the blatant deception that a "customer of record" was assigned to the interconnection facilities Core sought to use, any one of Verizon's stalling tactics, taken alone, was a mere unintentional breach. However Verizon's actions, taken as a whole, prove an intentional pattern of delay with the purpose of deliberately, wantonly and willfully injuring Core by delaying its interconnection. Even without Verizon's failure to return written communications, taking the OC-12 Mux offline, and refusing to honor Core's repeated pleas to interconnect Core to existing technically feasible facilities, Verizon's outright dishonesty, deceit and trickery in telling Core that it could not be interconnected because the facility had been assigned to an unnamed "customer of record" that was later found to be Core is by itself a manifestation of the rancor and actual malice intended toward Core by Verizon.

49

The actions by Verizon in this case are exactly what the Telecommunications Act of 1996 was designed to curtail. The Telecommunications Act of 1996 enables "Local Exchange Carriers to enter local telephone markets with ease and to reduce monopoly control of these markets and increase competition among providers." *Verizon Maryland, Inc. v. Core Communications, Inc.*, 405 Fed.Appx. 706 (4th Cir. 2010) citing *Verizon Communications Inc. v. FCC,* 535 U.S. 467, 489, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002); 47 U.S.C. § 251 *et seq*. The Act also <u>obligates</u> incumbent carriers to allow competitors to enter their local markets, 47 U.S.C. § 251(c)." (emphasis added) *Verizon* 535 U.S. at 492, 122 S.Ct. 1646. Additionally, the Act is designed to "address the practical difficulties of fostering local competition." *Id.*" *Verizon Maryland, Inc. v. Core Communications, Inc.*, 405 Fed.Appx. 706 (4th Cir. 2010). In deliberately delaying Core's interconnection, Verizon intentionally and wantonly violated the letter, the spirit, and the public policy behind the Telecommunications Act of 1996 without legal justification.

In view of this overwhelming evidence as found this Court, Verizon's actions were indisputably malicious. However, additional persuasion can be found in the findings of the Commission which were articulated by this Court. The Commission, after a hearing on this matter, determined that Verizon had breached a duty of fair dealing and good faith under Maryland contract law in that Verizon

did not provide interconnection to Core in as timely a fashion as it reasonably would have provided interconnection to any of its own customers, and specifically that it is undisputed that capacity was available and connection technically feasible and that Verizon denied access to this connection in bad faith. This court need not decide if the breach of the duty of good faith and fair dealing has any legal effect,[18] it only needs to see that the Commission, after an opportunity to view all of the facts, determined that Verizon acted in bad faith. "The Court of Appeals for the Fourth Circuit has equated bad faith with willfulness (*see Gilliam v. Armtex, Inc.,* 820 F.2d 1387, 1390 (4th Cir.1987)), and it has interpreted bad faith to mean acts that are malicious, fraudulent, deliberate, and willful. *See Teaching Co. Ltd. Partnership v. Unapix Entertainment, Inc.,* 87 F.Supp.2d 567, 592 (E.D.Va.2000) (citing *Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.,* 958 F.2d 594, 600 (4th Cir.1992))." *In Re Chaires,* 249 B.R. 101 (U.S.B.C, D.Md 2000). The finding by the commission by itself was enough for the District Court, to find malice on the part of Verizon, or at a minimum to decide that there was a genuine issue of material fact as to malice.

---

[18] Core has conceded in its Motion to Dismiss the Declaratory Judgment Action that the breach of the duty of good faith and fair dealing is only a type of breach and not a cause of action unto itself and is mooted because of the This Court's finding of Verizon's breach of contract on other grounds. This does not mean, however, that Verizon's intent, including malice, may not be deduced from its bad faith.

51

## CONCLUSION

For the reasons set forth above this Court Should Grant Summary Judgment in favor of Core and against Verizon on the Causes of Action for Concealment and Unfair Competition and set this matter for a hearing on both consequential and punitive damages.

## REQUEST FOR ORAL ARGUMENT

Appellant Core Communications, Inc. respectfully requests that the Court hear oral argument in this matter.

GLEATON WYATT HEWITT, PA


_____/s/ Ralph Gleaton_____
Ralph Gleaton
    SC District Court Number 6779
935 South Main Street, Suite 203
Greenville, SC 29601
(864) 250-9780
(864) 250-9784 (fax)
ralph@pgwhlaw.com

April 29, 2013

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. <u>12-2572</u>     **Caption:** <u>Core Communications v. Verizon MD</u>

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the  type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✓]   this brief contains ____13,280____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ]   this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [ ]   this brief has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

   [✓]   this brief has been prepared in a monospaced typeface using <u>Microsoft Word 2008, version 12.3.b</u> [*identify word processing program*] in <u>Times Roman 14 pt.</u> [*identify font size and type style*].

<u>(s)</u> <u>Ralph Gleaton</u>

Attorney for <u>Core Communications</u>

Dated: <u>4-29-13</u>

## CERTIFICATE OF SERVICE

I certify that on April 29, 2013 the foregoing document was served on

all parties or their counsel of record through the CM/ECF system if

they are registered users of if they are not, by serving a true and

correct copy at the addresses listed below:


/S/ _____          April 29, 2013 _____

Ralph A. Gleaton